U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

SAENZ, JANET )
    Plaintiff )
v )  Case No.: 20 CV 07135
)
PREMIER EMPLOYEE SOLUTIONS, LLC, )
    Defendant )

## COMPLAINT

The Plaintiff, Janet Saenz, by and through her attorney, Richard Broderick, states Defendant, Premier Employee Solutions, LLC, has violated her rights under the American's with Disabilities Act and discriminated against her. In furtherance of her complaint the Plaintiff, Janet Saenz states:

1. Plaintiff, Janet Saenz, currently resides at 2018 Alpine Way, Plainfield, IL 60586 and for all times pertinent to this action resided in the State of Illinois.

2. Defendant, Premier Employee Solutions, LLC has a principal business office located at 3596 Mountain Vista Parkway, #3, Provo, UT 84606 and is a foreign entity formed under laws of the State of Arizona.

3. Premier Employee Solutions, LLC does business in the State of Illinois as an employment services service.

4. Premier Employee Solutions, LLC has offices multiple offices in the State of Illinois, some of which are at 1) 2400 Canton Farm Rd., Ste 1, Cresthill, IL 60403, 2) 180 N. Bolingbrook Dr., Bolingbrook, IL 60440-2350 and 3) 2112 W. Galena Blvd., Ste 2, Aurora, IL 60506-3255 for all times pertinent to this action.

5. Defendant, Premier Employee Solutions, LLC hired Plaintiff, Janet Saenz, to work for Defendant in or about, Feb. 5, 2018 as an on-site-manager to supervise temporary employees

that were hired to perform work for Defendant Premier Employee Solutions services customer.

6. When Plaintiff was originally hired by Defendant, Defendant assigned Plaintiff to work for at the Sonoco facilities.

7. In, or about, August 2018 Defendant transferred Plaintiff to work at a new customer's facility, Menasha Packaging Company, LLC, located at 800 S Weber Rd, #A, Bolingbrook, IL 60490.

8. When Defendant assigned Plaintiff to work at Menasha Packaging Company's facilities in, or about, August 2018 Plaintiff was assigned as an On-site manager to supervise one shift of employees and her assigned work hours were from 5:45 a.m. until 2:30 p.m.

9. In or about Nov. 2018 Defendant increased it's services to Menasha Packaging Company and added a second shift of workers.

10. At all times relevant to this action Cory Woodward was an employee of Defendant Premier Employee Solutions, LLC and a Supervisor of Plaintiff Janet Saenz.

11. Defendant Promoted Cory Woodward from an area Manager to an Area Vice-President in or about August, 2018.

12. At the time Defendant added a second shift to Menasha Packaging Company, Plaintiff's supervisor, Vice-President, Cory Woodward increased Plaintiff's work hours on site from 5:45 a.m. to 2:30 p.m. to 5:45 a.m. to 3:30-3:45 p.m., and also managing the second shift services by taking calls and emails while off-site until 11:30 p.m. without any additional compensation.

13. In or about Nov. 2018 when Plaintiff's work hours and duties were increased Defendant's employee and agent, Cory Woodward, informed Plaintiff that the increase in time and duties

would be temporary until an additional employee could be added to the staff to take over those added responsibilities and duties.

14. In, or about, April, 2019 Defendant's placed Ms. Rhonda Stevens in the position of Area Manager an as a direct supervisor of Plaintiff.

15. In, or about April 16, 2019, Ms. Rhonda Stevens' expressed to Plaintiff that she preferred warehouse managers to be male.

16. At all times relevant to this action, Ms. Misty Moline was an employee or agent of Defendants and worked in the Safety and Risk Dept.

17. On, or about, June 11, 2019, Plaintiff was reporting to Ms. Moline regarding a temporary employee who did not appear for work for the days work. At that time Plaintiff asked Ms. Moline when Defendant was going to provide the additional staffing for the second shift because as a person working from 5:45 a.m. to 3:45 p.m. on site as well as off site until 11:30 p.m. it had been eight (8) months and she was getting tired of the long days and she has an auto immune disorder.

18. Plaintiff **<u>DID NOT</u>** At any time during the conversation, on June 11, 2019 between Misty Moline and Plaintiff, make a request for any type of work accommodation.

19. On June 12, 2019 Defendant's Employee Ms. Rhonda Steven's contacted Plaintiff and informed Plaintiff not to return to work until she has a medical exam and furnishes Defendant documentation of Plaintiff's physical health and accommodations.

20. On June 12, 2019 Plaintiff received an e-mail from Mr. Craig Finders and Rhonda Stevens with forms for Plaintiff's doctor to complete.

21. The Plaintiff went to her medical physician on or about June 13, 2019 to have the documentation from Defendant completed which the Dr. did complete.

22. On June 13, 2019 Plaintiff returned the documentation to Defendant and Defendant declined to accept the completed forms and demanded further detailed medical information of Plaintiff's personal medical health.

23. On June 14, 2019 Defendant continued to refuse allow Plaintiff to return to work.

24. On June 17, Plaintiff further attempted to obtain medical authorization to return to work and Defendant refused to permit Plaintiff to return to work.

25. On June 18, 2019 Plaintiff retained an attorney who wrote a letter to Defendant, to the attention of Mr. Craig Finder (Director of Safe & Risk Utah), demanding Defendant cease demands for Plaintiff's personal private medical information and permitted Plaintiff to return to work.

26. Defendant permitted Plaintiff to return to work on June 19, 2019.

27. On or about June 19, 2019 the Defendant transferred Plaintiff from her position as an on site manger at Menasha Packaging Company to an inside recruiting position at Defendant's Bolingbrook, office and falsely alleged the position at Menasha Packaging Company had been terminate.

28. On or about June 19, 2019 the Defendant assigned Plaintiff to work in the Bolingbrook, IL office of Defendant's as an inside recruiter for Defendant.

29. Defendant placed Plaintiff at the Bolingbrook office and made the work environment hostile and harassing to Plaintiff to compel her to quit.

30. 42 U.S.C. § 12101 states:

    "(a)  **Findings**

    The Congress finds that--

**(1)** physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;

**(2)** historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

**(3)** discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

**(4)** unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

**(5)** individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

**(6)** census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

**(7)** the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

**(8)** the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States

billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

**(b) Purpose**

It is the purpose of this chapter--

**(1)** to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

**(2)** to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

**(3)** to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

**(4)** to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."

31. Sec. 12102. Definition of disability

As used in this chapter:

(1) Disability

The term "disability" means, with respect to an individual

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major Life Activities

(A) In general

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

32. 42 U.S.C. § 12112 states:

"(a)  General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b)  Construction

As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes--

(1)  limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

(2)  participating in a contractual or other arrangement or relationship that

has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

(3)   utilizing standards, criteria, or methods of administration--

(A)   that have the effect of discrimination on the basis of disability;  or

(B)   that perpetuate the discrimination of others who are subject to common administrative control;

(4)   excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

(5)(A)   not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity;  or

(B)   denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

(6)   using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity;  and

(7)   failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

(c)   Covered entities in foreign countries

(1) In general

It shall not be unlawful under this section for a covered entity to take any action that constitutes discrimination under this section with respect to an employee in a workplace in a foreign country if compliance with this section would cause such covered entity to violate the law of the foreign country in which such workplace is located.

(2) Control of corporation

(A) Presumption

If an employer controls a corporation whose place of incorporation is a foreign country, any practice that constitutes discrimination under this section and is engaged in by such corporation shall be presumed to be engaged in by such employer.

(B) Exception

This section shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.

(C) Determination

For purposes of this paragraph, the determination of whether an employer controls a corporation shall be based on--

(i) the interrelation of operations;

(ii) the common management;

(iii) the centralized control of labor relations; and

(iv) the common ownership or financial control,

of the employer and the corporation.

(d) Medical examinations and inquiries

(1) In general

The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries.

(2) Preemployment

(A)  Prohibited examination or inquiry

Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

(B)  Acceptable inquiry

A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

(3)  Employment entrance examination

A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if--

(A)  all entering employees are subjected to such an examination regardless of disability;

(B)  information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that--

(i)  supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii)  first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment;  and

(iii)  government officials investigating compliance with this chapter shall be provided relevant information on request;  and

(C)  the results of such examination are used only in accordance with this subchapter.

(4)  Examination and inquiry

(A)  Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an

individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B)   Acceptable examinations and inquiries

A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site.   A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C)   Requirement

Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3)."

33. 42 U.S.C. § 12203 states:

"(a)   Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b)   Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

(c)   Remedies and procedures

The remedies and procedures available under sections 12117 , 12133 , and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively."

34.  Defendant perceived and treated Plaintiff as if she was disabled.

35. Defendant Plaintiff demanded Plaintiff submit to medical examination and production of medical documents to return to work after June 11, 2019.

36. Defendant retaliated against the by replacing Plaintiff at Menasha Packaging Company, LLC with a male worker and assigning her to the Bolingbrook, IL office as an inside recruiter.

37. Plaintiff resigned because of the hostile work environment on or about July 29, 2019.

## PRAYER FOR RELIEF

The Plaintiff respectfully request to be compensated for the injuries she has suffered from Defendant.

Respectfully submitted.

s/Richard Broderick
Richard Broderick

Richard Broderick
Attorney for Respondent Janet Saenz
1508 W. Arthur Ave, #3
Chicago, IL 60626-4903
A.R.D.C. # 06221017
847.920.5066: phone
847.920.50680: fax
rbrodericklaw@aol.com

EEOC Form 161 (11/16)      **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**DISMISSAL AND NOTICE OF RIGHTS**

To: Janet Saenz
2018 Alpine
Plainfield, IL 60586

From: Chicago District Office
230 S. Dearborn
Suite 1866
Chicago, IL 60604

[ ] On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2020-01602 | Gregory T. Mucha, Investigator | (312) 872-9686 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

- **NOTICE OF SUIT RIGHTS** -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Julianne Bowman/np*      November 10, 2020

Julianne Bowman,
District Director      (Date Mailed)

closures(s)

cc: PREMIER EMPLOYEE SOLUTIONS
c/o Michael A. Wilder, Esq.
Littler Mendelson, P.C.
321 N. Clark Street Suite 1000
Chicago, IL 60654